### 8510
#### CAVE v. SEABOARD AIR LINE RY.

1. CARRIER—PASSENGER.—It is the duty of the carrier to furnish its passengers with seats and the remedy of the passenger for failure to do so is suit for damages for breach of contract.

2. IBID.—IBID.—DEFENSE.—That the demand on the carrier for facilities is so sudden and unexpected that it could not have anticipated it and furnished sufficient accommodations should be set up as a defense. Here such defense was not set up and there was no evidence tending to prove it.

3. IBID.—IBID.—PUNITIVE DAMAGES.—Failure of the carrier to furnish seats for passengers under circumstances which show the carrier had every reason to know the accommodations furnished were not sufficient will support punitive damages.

4. IBID.—IBID.—IBID.—ABUSIVE LANGUAGE.—Punitive damages may be awarded a passenger for language used by the conductor to him when he demanded a seat before giving up his ticket, which is calculated to insult, humiliate or wound the feelings of a person of ordinary sensibilities and was so intended.

MR. JUSTICE FRASER, *with whom concurs* MR. JUSTICE WOODS, *thinks the language used here does not warrant punitive damages.*

Before MEMMINGER, J., Hampton, December, 1912. Affirmed.

Action by T. L. Cave against Seaboard Air Line Railway. Defendant appeals.

*Messrs. Lyles & Lyles,* for appellant, cite: *No abusive language used by conductor:* 62 S. C. 1; 136 Am. St. R. 307; Hutchison, sec. 1575; Thompson on Neg., sec. 2546;

6 Cyc. 582. *Standing on platform is contributory negligence:* 44 Am. R. 120; 81 S. C. 100.

*Messrs. J. W. Vincent* and *C. B. Searson,* contra.

April 7, 1913. The opinion of the Court was delivered by

MR. JUSTICE HYDRICK. Desiring to attend the automobile races at Savannah, Ga., in November, 1910, plaintiff bought a round trip excursion ticket from Estill, S. C., to Savannah and return over defendant's road. On the return trip the crowd on the train was so great that plaintiff could not get a seat. When the conductor demanded his ticket he refused, at first, to give it to him unless he would furnish him a seat, but finally gave up his ticket, under threat of expulsion from the train.

Thereupon, plaintiff brought this action for damages, alleging the purchase of the ticket, the failure of defendant to furnish him a seat, that he was compelled, on account of the crowd on the train, to ride on the platform, and that he was made sick by the exposure, and, also, that the conductor insulted him when he demanded a seat as the condition of surrendering his ticket. The defendant denied the allegations of the complaint, and pleaded contributory negligence on the part of plaintiff in riding on the platform.

Plaintiff testified that he not only could not get a seat, but that he could not get standing room within the car, and was, therefore, compelled to ride on the platform, and that he was made sick from the exposure; that, having been on his feet all day, he was too tired to stand up, and he folded up his overcoat and sat on it on the platform, as it was against the rules of the company for passengers to stand on the platform, and it was dangerous to do so.

The foregoing statement of the evidence is sufficient to show that there was no error in refusing defendant's motion for the direction of the verdict.

The duties and obligations of carriers to furnish passengers with seats, and the correlative rights and remedies of passengers, where seats are not furnished, are well expressed in the note to the case of *Chesapeake & Ohio Ry. Co.* v. *Austin,* 136 Am. St. R. 312, as follows:

"It is a well settled rule that carriers of passengers must furnish such accommodations as are practicable, and that this requirement includes seats. The carrier is bound, in fulfillment of its contract, to provide seats for its passengers when practicable. Failing in this, it has violated one of the essential obligations of its agreement. It can no more claim a performance of the contract created by the sale of a ticket or the proffered payment of fare for transportation without a seat, than to furnish a seat without the transportation. The one implies the other, and both must go together, else the company has failed in its obligation. The supplying a seat is not only a reasonable and practicable duty, but it is an imperative requirement that can not be avoided by any act of the company. * * *

"Extreme cases of extra, unexpected travel, of which the carrier had no notice, and where the passenger, when he presents himself for transportation, is advised by the company of the crowded condition of the train, or when it can be shown that he had independent knowledge of such fact, together with the fact that its usual trains were run, that such were sufficient under ordinary circumstances; also that it exercised due care in calling into operation all its means at hand, may serve as an excuse for not furnishing seats sufficient to meet the extra demand of the moment. But even under such circumstances the passenger must be advised or have knowledge of the inability of the company to supply him with a seat before it can escape its contract obligation. * * *

"Being entitled to a seat, a passenger has a right to refuse to accept anything less than the complete fulfillment of the contract on the part of the company, and if not provided

with a seat, may refuse to give up his ticket or to pay fare. He has, however, no claim to a free ride, and if he accepts such accommodations as are afforded, he is in duty bound to pay fare. * * *

"From the foregoing considerations, there is but one of two alternatives for the passenger without a seat; that is, to either pay fare or leave the train. If he is willing to accept part performance and remains on the train, he must pay fare. If he desires complete fulfillment, he must leave train at the first convenient opportunity. * * *

"If a passenger rides on a train and refuses to pay fare for want of a seat, he may be ejected. He must, however, be put off at a safe and convenient place, which would necessarily mean a station. It is the duty of the conductor to take up tickets or collect fare of everyone accepting passage on a train, with or without a seat, and a passenger refusing to comply with this reasonable regulation may be ejected without liability for the ejection."

For the breach of the carrier's contract, or of its duty to the public, the passenger's remedy is an action for damages. Ib. 315.

When the plaintiff alleged his contract and the breach therefor, if the defendant desired to avail itself of the defense that the demand on its facilities of conveyance was so sudden and unexpected that it could not have been anticipated and provided for by the exercise of due care and diligence, it should have alleged the facts necessary to establish that defense, and should have proved them at the trial. But that defense was not set up in the answer and there was no evidence tending to prove it, except the fact that the crowd was unusually large, but not that it was unusually large for such an occasion; and there was no evidence that defendant should not have reasonably anticipated such a crowd, or that, anticipating it, it could not, by the exercise of due diligence, have provided for its accommodation. The only evidence of any effort

to provide accommodation for the extra crowd of passengers was that of the conductor, who said he asked the station master at Savannah for an extra car, and he said they did not have one, as they were all in service. But there was no evidence that it was the duty of the station master to provide extra cars, or that defendant used due diligence in calling into operation all the means at hand or accessible to provide for the emergency. It was apparent, before the train left Savannah, that the accommodations were not sufficient to meet the demand.

There was no error in submitting to the jury the issue of punitive damages, for the evidence in the case, and the lack of evidence, which it was incumbent on the defendant to introduce, afforded reasonable ground for an inference of indifference to the rights of the passengers on the part of defendant, in failing to provide adequate accommodations for them. The defendant knew, or should have known, that its train would not accommodate all who offered themselves as passengers thereon. Nevertheless, the testimony shows that thirty-eight passengers, who had tickets for another train, were admitted to this train, which was a special excursion train, and there was testimony that less than that number had to stand.

Moreover, there is no evidence that the passengers were informed, before the train started, that seats could not be provided for all of them. True, they might have seen for themselves that such was the case, but how were they to know that the defendant would not, at any moment, provide additional accommodations by attaching another car to the train, before it started, or even after it had started, at some near-by station or sidetrack, where the company may have had extra cars stored? It is within the observation of all who have traveled much, that this is frequently done. To a passenger who left the train on account of its crowded condition, and, thereafter, sued for damages for breach of his contract, the defendant might have said: If you had

stayed on the train, you would have been given a seat, before the train left the station, or within a reasonably short time thereafter. Of all such matters, passengers cannot be presumed to know, and it is the duty·of the carrier to inform them.

Besides, there was another ground which required submission of the issue of punitive damages to the jury. The plaintiff alleged that the conductor insulted him, and held him up to the scorn of the other passengers. Upon this point, the conductor, after testifying to plaintiff's insistence upon being given a seat, before surrendering his ticket, and of his compelling him to give it up, by threatening to put him off the train, was asked this question: "Did you have any further conversation with him?" His answer was: "No; but I told him I had a lady friend, and would ask her to give him her seat, and two gentlemen got up and offered him their seat." Another of defendant's witnesses testified: "Did the conductor say anything about getting a seat for them? I think he said he had a lady friend up in the car, and he would ask her to get up and give him the seat? What happened then? Two gentlemen in the end of the day coach sitting in the little seat down by the door, got up and said: 'No, don't do that; if he must have a seat, let him have this seat.' Both doors were open, and some people were attracted by the noise."

It is doubtful if the conductor could, upon mature deliberation, have adopted a more effectively delicate way to insult a gentleman and humiliate him before others than to intimate that he was so far lacking in that courtesy, consideration and respect which is generally recognized as due from gentlemen to ladies, according to the standards which obtain in decent and polite social intercourse, as to permit a lady to be asked to give up her seat for him. Observe the prompt protest of the two gentlemen "in the little seat down by the door:" "No, don't do that. If he must have a seat, let him have this seat." Doubtless the plaintiff felt that he

was held up to the scorn and contempt of all who heard it. If the thrust was intended to have that effect (and that was a question for the jury), it was such a wanton invasion of plaintiff's right to civil treatment as a passenger as to warrant the infliction of exemplary damages. For the plaintiff was strictly within his rights in demanding a seat, and it was the duty of the conductor to furnish it, or give him a reasonable explanation of his inability to do so. At any rate, he had no right to meet his lawful demand with any such contemptuous insinuation, and it was properly left to the jury to say what weight they would give it in awarding damages. It was certainly an aggravating circumstance.

In *Daniels* v. *R. Co.*, 62 S. C. 1, 39 S. E. 762, the company asked the Court to charge that it was not liable for rude language used by the conductor, lawfully requiring a passenger to get off the train. The Court refused to so charge, but modified the request by saying that if the language used by the conductor should go to an unreasonable extent, so as to become abusive, the company would be liable. On appeal this Court held, in response to an exception assigning error in so modifying the request: "We do not see any error in the modification of this request, which appears in the Judge's charge, for he practically instructed the jury that the company would not be liable for any language used by the conductor unless it was abusive, and there was no pretense that any such language was used; for, according to the plaintiff's own testimony, the language used was: 'Get in there; get your things and get out of here; got no time to waste.' While it is quite probable that the conductor spoke in a quick, peremptory tone, there was no element of abuse in what he said to her when she went to the door of the car, seeing the people in front of her getting off." This was far from holding, as a general proposition, that a carrier is not liable for *any language* used by the conductor, unless it was abusive. On the contrary, it merely holds that a carrier would be liable for abusive language of its conductor to a

passenger, but that the language in that case was not abusive.

The Courts have not defined, and it would be unwise to attempt to define accurately, the kind of language which must be used by a conductor to a passenger before liability will be imposed upon the carrier. Ordinarily too much depends upon the circumstances, the relation of the parties, the tone and manner in which a thing is said, for any exact definition or rule to be laid down. But there can be no doubt that where a conductor uses language to a passenger which is calculated to insult, humiliate, or wound the feelings of a person of ordinary feelings and sensibilities, and it is intended to have that effect, the carrier is liable, for the contract of carriage impliedly stipulates for decent, courteous and respectful treatment at the hands of the carrier's servants. *Croaker* v. *Chicago & C. Ry.,* 36 Ws. 657, 17 Am. Rep. 504; *Ballard* v. *L. & N. R. Co.,* 85 Ky. 307, 7 Am. St. Rep. 600; *Quo* v. *Savannah etc. R. Co.,* 103 Ga. 125, 68 Am. St. Rep. 85, 4 L. R. A. 483; *Lane* v. *Knoxville Traction Co.,* 46 L. R. A. 549, 6 Cyc. 602, 5 A. & E. Enc. L. (2d) 550.

The judgment is affirmed.

MR. JUSTICE FRASER, *dissenting.* This is an action for damages to a passenger. The plaintiff claims that he was a passenger on the defendant's road from Estill, S. C., to Savannah, Ga., with a return ticket and returned on an excursion train. That no seat was provided for him and he was forced to ride a part of the way on the platform of the coach and caught cold, from which he suffered considerably. That when he demanded a seat from the agent of the defendant, the agent insulted the plaintiff and held him up to the scorn of the other passengers. The plaintiff claimed that his injuries were negligently and wilfully inflicted. The defendant put in a general denial and also pleaded contributory negligence in that it was not necessary

19—94

for plaintiff to stand on the platform and he did so in viola-
tion of instructions to passengers. On the trial the defendant
claimed that if the train was overcrowded the plaintiff could
not recover because he was guilty of contributory negli-
gence in boarding an overcrowded train.

The jury found a verdict for plaintiff for two hundred
dollars. From the judgment on this verdict defendant
appealed.

There are five exceptions, but they raise but three ques-
tions:

1. Was there any evidence of actionable language?

2. Was there any evidence of negligence or wilfulness?

3. Was there indisputable evidence of contributory neg-
ligence?

1. Was there any evidence of actionable language? The
exact language used was not given on the trial, and as this
Court has held in *Daniels* v. *Railroad*, 62 S. C., p. 16,
39 S. E. 762, that a railroad company is "not liable
for any language used by the conductor unless it was
abusive," the exception that embodies this proposition should
be sustained.

2. Was there any evidence of negligence or wilfulness?
There was some evidence. There was evidence as to the
crowd in Savannah at the time. The size of this special
excursion train was shown. It was for the jury to
say whether reasonable care for the safety and con-
venience of its passengers required better accom-
modations, and if the jury thought that reasonable care did
require more room, then it was also their province to say
whether the failure to provide for the crowd they might
reasonably expect was wilful and wanton or no. Inasmuch
as this case will have to go back for a new trial, this Court
ought not to discuss the evidence further.

3. Was there indisputable evidence of contributory neg-
ligence? This Court cannot say that there was. Whether
it was negligence in the plaintiff to get on the train; whether

it was too crowded to allow him standing room inside; whether it was his duty to put on his overcoat or whether the want of an overcoat was the cause of plaintiff's sickness, were all questions for the jury. So far as I know the jury may have based its finding solely on insulting language and I think

The judgment of this Court should be that the judgment of the Circuit Court be reversed and the cause remanded for a new trial.

MR. JUSTICE WOODS, *concurring in result.* I concur in the conclusion of Mr. Justice Fraser that there was no language imputed to the conductor by the witnesses which warranted a verdict for the plaintiff on the ground that it was insulting or abusive, or actionable. The plaintiff and his witnesses, on this point, testified to nothing more than that the conductor threatened to put him off unless he paid his fare; and it is not claimed that this threat of the conductor amounted to such opprobrious language as to warrant the finding of punitive damages. It is true that the conductor and another witness testified that the conductor told the plaintiff that he "had a lady friend and would ask her to give him her seat." But it would be quite unfair to take this language out of its connection. The witness, Sapp, testified that when the conductor said this the plaintiff was cursing and acting as if there would be a fight; and the conductor testified that his behavior was boisterous. The record makes it evident that the plaintiff did not regard this remark of the conductor as an insult, for it was not alluded to by the plaintiff or any of his witnesses. Under these circumstances it seems to me to be going too far to say that the remark of the conductor was meant as insulting or opprobrious rather than an effort to placate a noisy and boisterous passenger.

I do not think, however, the judgment should be reversed. The verdict of $200.00 was a reasonable one, and well sus-

tained by the evidence of the failure of the defendant to furnish sufficient accommodations for its passengers without any plausible explanation or excuse, and of the sickness and suffering which resulted to the plaintiff. It seems to me there is no doubt that any fair jury, under the evidence, would have found a verdict for the plaintiff, and that found being beyond doubt reasonable the error of the Circuit Court should not be regarded prejudicial *Edgefield Mfg. Co.* v. *Maryland Casualty Co.,* 78 S. C. 73, 58 S. E. 969.