Kim HENDERSON, Appellant,

v.

Ralph WELLMANN, Appellee.

Ralph Wellmann, Appellant,

v.

Kim Henderson, Appellee.

No. 01–99–01190–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 15, 2001.

Kathlyn C. Wilson, Austin, for appellant.

Sam E. Rowland, Bryan, for appellee.

Panel consists of Justices MIRABAL, NUCHIA, and PRICE.*

## OPINION

NUCHIA, Justice.

This is an appeal of a judgment rendering a monetary award on a jury verdict for plaintiff, Ralph Wellmann, on his claim for intentional infliction of emotional distress and rendering a judgment non obstante veredicto (JNOV) on his claim for libel and slander. Defendant, Kim Henderson, appeals the monetary award, and plaintiff complains about the admission of certain

---

* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

evidence at trial and appeals the JNOV on the libel and slander claims. We affirm in part and reverse in part and render judgment that Wellmann take nothing.

## BACKGROUND

Ralph Wellmann, a middle-aged male, was an employee of Texas A & M University in the Office of Planning and Institutional Research. He had been employed in various departments of the university for 27 years. Kim Henderson, a 20 year old student, was a part-time employee in the same office. In April 1996, Henderson spoke to the executive director of the office, William Dowling, about several incidents that occurred between her and Wellmann that, she said, made her feel uncomfortable. Dowling took notes during this meeting with Henderson and reduced the notes to writing. The final memorandum from these notes, dated April 29, 1996, is as follows:

MEMORANDUM FOR RECORD

This morning Kim Henderson met with me concerning a variety of incidences involving Ralph Wellmann's conduct over the past several months which she believes were inappropriate. She had mentioned these last week to her Supervisor, Debbi Guess and later discussed them with her Mother. Her Mother was very concerned and urged her to discuss them with me.

Kim is a twenty-one year old Biomedical Science student who has been employed in this office for approximately one year. She is very bright and a willing worker. The following recaps the situation that Kim described to me.

1. On one occasion last November Kim went with Ralph to a building (old house) located behind the Veterinary Medical College which was assigned to the Aggie Raptor Association. This old house had not been on our official inventory and was being measured. Kim said that as they were walking around the house, taking measurements she was writing them down on her clipboard. Ralph would come up beside her and stand in a way that his body would be pressing on her arm as he observed her writing down the measurements. She said this made her very uncomfortable but she did not mention it to anyone at the time.

2. On two other occasions when they went to the Recreational Sports Building to get some building information, rather than going about their work he wanted to "buy her a coke" and visit socially. She said that she just ordered a small coke and finished it quickly and told him that she needed to get on back because she had a class she had to get to.

3. On the way back to the office from one of the trips Kim said Ralph [asked] her what she was doing this weekend. He [asked] her if she would like to go out and shoot pool and drink some beer with him.

4. One weekend when Kim was not at home Ralph appeared at her apartment looking for her. He said that he was on the way back from his ranch in Caldwell and just dropped by to see her. Kim said that she was shocked that he would even know where she lived and it concerned her that he would come by her apartment. Later on he mentioned that he had come by her apartment again and that her car was not there. She wondered how he knew what kind of car she had and this also worried her.

5. One day when Kim was working at Ralph's desk, helping with data in-

put, she pulled open his lap drawer to get a ruler and noticed a card with her name and home phone number written on it.

6. She said on occasions when she called in sick Ralph would call her apartment to find out how she was feeling, and once when she took off for Spring Break he called her apartment and said that he didn't realize that she was taking off early and hadn't had a chance to say good-bye and wanted to wish her a good Spring Break.

7. On another occasion he [asked] her some fairly in-depth questions about her boyfriend Craig. Kim said she felt questions about where he was from and his major and even where they met would have been appropriate, but Ralph seemed to want to probe a little more personally into the fact that she had not had very many boyfriends this semester and how serious were they and things that Kim felt were inappropriate.

8. Kim was assisting in the update [of] the facilities inventory and worked in Ralph's office for about two days. Kim said Ralph interrupted her a lot and seemed to want to chat about what she was doing and she became uncomfortable to the point that she moved into the work room to finish her project.

9. Another time he [asked] Kim if she would like to go with him out to his farm to get some firewood for her fireplace.

This memorandum was signed by Dowling, and Henderson signed to show her concurrence on April 30, 1996.

A second "Memorandum for the Record," dated May 1, 1996, stated as follows:

Mel Lasell and I met with Ralph Wellmann today concerning alleged sexual harassment incidences reported by Ms. Kim Henderson (copy attached).

After Mr. Wellmann read the complaints he gave, in our opinion, vague and unconvincing explanations of these situations. He stated that what he did after hours was "no ones business if it was legal and she went voluntarily." He repeatedly stated that "if I had known these things were bothering her, I would have backed off." He also indicated that the allegations were "no big deal" and "nothing that she couldn't have handled." He did offer to apologize to Kim for any offense and to stay away from her.

Based on Mr. Wellmann's lack of acceptable performance and professionally [sic] development, his unwillingness to meet office quality standards as noted in previous correspondence, and these allegations of unprofessional conduct it is my intention to offer Mr. Wellmann the option to resign or be terminated from this office effective May 31, 1996.

This memorandum is signed by Dowling as executive director and Mel Lasell as associate director. It is also signed as "received" by Wellmann.

Wellmann appealed his termination through the university's grievance procedure, and the case went to advisory arbitration. The arbitrator ruled in Wellmann's favor, but the university refused to reinstate him. Wellmann then sued Henderson for libel, slander, interference with an employment contract, and intentional infliction of emotional distress.

The jury found in favor of Wellmann on the issue of libel and found damages for mental anguish, loss of reputation, and loss of earning capacity of $290,000. The jury also found in favor of Wellmann on the issue of slander, but awarded no damages. The jury found in favor of Wellmann on

the issue of intentional infliction of emotional distress and awarded damages of $20,000 for mental anguish and $50,000 on its finding of malice. The jury found in favor of Henderson on Wellmann's claim of interference with an employment contract.

The trial court granted Henderson's motion for JNOV on the issues of libel and slander. Although the judgment does not state the basis for the JNOV, both parties, in their appellate briefs, indicate that it was based, at least in part, on the one-year bar in limitations for libel and slander. Final judgment for Wellmann was rendered only on the claim of intentional infliction of emotional distress and the finding of malice.

## DISCUSSION

### Henderson's appeal

■ In her first issue, Henderson contends the conduct alleged by Wellmann is not so outrageous as to be beyond the bounds of decency and intolerable in a civilized society. Henderson argues that Wellmann did not present facts that amount to extreme and outrageous conduct. Because Henderson presents a "no evidence" issue, we consider only the evidence and inferences that tend to support the finding, disregarding all evidence and inferences to the contrary. *Vannerson v. Vannerson*, 857 S.W.2d 659, 666 (Tex. App.—Houston [1st Dist.] 1993, writ denied).

■ In *Twyman v. Twyman*, the Texas Supreme Court adopted the tort of intentional infliction of emotional distress as set out in section 46(1) of the Restatement (Second) of Torts. 855 S.W.2d 619, 621–22 (Tex.1993). To recover for intentional infliction of emotional distress, a plaintiff must establish that (1) the defendant acted intentionally or recklessly, (2) the conduct was extreme and outrageous,

(3) the actions of the defendant caused the plaintiff emotional distress, and (4) the emotional distress suffered by the plaintiff was severe. *Id.* at 621. Outrageous conduct is defined as conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting RESTATEMENT (SECOND) TORTS § 46 cmt. d (1965)). Whether a defendant's conduct is extreme and outrageous is a question of law. *Brewerton v. Dalrymple*, 997 S.W.2d 212, 216 (Tex. 1999).

■ A claim for intentional infliction of emotional distress does not lie for ordinary employment disputes. *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 612–13 (Tex.1999). Thus, wrongful termination, standing alone, is not evidence of extreme and outrageous conduct. *See Southwestern Bell Mobile Sys., Inc. v. Franco*, 971 S.W.2d 52, 54 (Tex.1998). Insensitive or rude behavior, mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the level of extreme and outrageous conduct. *Bruce*, 998 S.W.2d at 612. Behavior is not outrageous simply because it is tortious. *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex.1994); *see also Franco*, 971 S.W.2d at 54 (wrongful termination in unnecessary presence of coworkers, forcing terminated employees to collect and remove belongings in front of others and immediately repossessing car phones belonging to employer falls far short of extreme and outrageous conduct); *C.M. v. Tomball Reg'l Hosp.*, 961 S.W.2d 236, 245 (Tex.App.—Houston [1st Dist.] 1997, no writ) (Department of Human Services caseworker's rude, insensitive, and uncaring treatment of minor rape victim did not rise to level of outrageous conduct).

In his third amended original petition, Wellmann alleged that Henderson filed false sexual harassment charges against him and orally communicated the same allegations to her mother, a coworker (Debbie Guess), and her supervisor (Glenn Dowling). He further alleged that she engaged in a continuing pattern of extreme and outrageous conduct, intentionally or recklessly, that caused him to suffer severe emotional distress and certain damages.

The evidence at trial established that Henderson first told her mother [1] that she felt certain conduct of Wellmann was inappropriate and made her uncomfortable. Her mother suggested that she talk with her immediate supervisor, Debbie Guess, about the problem. Guess advised Henderson to speak to Dowling, director of the department. Henderson made an appointment with Dowling and told him about specific incidents that caused her concern. Dowling took notes and reduced them to a written statement, which, after making two additions, Henderson signed. The next day, Dowling, with Lasell present, showed the memorandum to Wellmann.

At trial, Wellmann admitted that most of the incidents described in the memorandum occurred, although he denied the accuracy of some details. He denied, in their entirety, items three (the invitation to shoot pool and drink beer) and nine (the invitation to go to his farm). He also denied item one in part, testifying that he came close to Henderson only on one occasion and did not recall his body pressing against her. However, he said he had to get close enough to read her notes with his bifocals.

We hold that, under the facts of this case, Henderson's complaint about Wellmann, her co-worker, to a supervisor or person in charge and her signing a statement based upon that complaint, even assuming, as we must, that the statements denied by Wellmann are false, do not rise to the level of extreme and outrageous conduct necessary for a claim of intentional infliction of emotional distress.

Wellmann also contends there is more in this case. In his brief, Wellmann argues that "Henderson went so far as to appear at Wellmann's church and sit in the pew in front of Wellmann and his wife." At trial, Mrs. Wellmann testified that she saw Henderson at their church on one occasion. She said, "She was in our church the week after Ralph was fired. I had never seen her before and I've never seen her again. It's like she still wanted to carry this on." Mrs. Wellman testified that Henderson sat "[r]ight in front of us" and that it made her feel "[n]ot very good." The only other testimony regarding this incident was by Henderson, who explained that she was attending her boyfriend's church with her boyfriend and did not know it was the Wellmanns' church.

Wellmann did not testify about this encounter. Thus there is no evidence that the incident was any cause of emotional distress to him. Furthermore, Henderson's conduct in going to that church on one occasion is not extreme and outrageous.

We sustain Henderson's first issue. Therefore, we do not reach Henderson's second and third issues regarding whether Wellmann's emotional distress was severe and the application of the statute of limitations.

**Wellmann's appeal**

In his first issue, Wellmann contends that Henderson's intentional failure

1. We note that this sequence varies slightly from that in Dowling's memorandum; however, we do not consider the variation material.

to respond to his request for disclosure requires the exclusion of all evidence and witnesses required to be disclosed by rule 194 of the Texas Rules of Civil Procedure.

The trial court notified the parties that the jury trial would begin on March 23, 1999. On February 16, 1999, Wellmann faxed to Henderson a rule 194 request for disclosures. On March 22, Henderson, by letter, informed Wellmann that she would not respond to the request for disclosures because the request was untimely under the rules. Wellmann objected to Henderson's failure to respond to his request, and the trial court overruled Wellmann's objection.

After Wellmann rested his case-in-chief, he again objected to Henderson's failure to make the requested disclosures and asked the court to strike all witnesses and evidence that should have been disclosed. After some discussion, both parties and the trial court agreed that Henderson's response to the request for disclosures was due on March 22, 1999. Henderson argued that, under rule 193.6(c), the court could grant a continuance to allow a response and to allow Wellmann to conduct discovery regarding any new information presented in the response. The following then occurred:

THE COURT: You wanted to know who the witnesses were on the day of jury selection?

MR. SWEARINGEN: That's correct, Your Honor.

THE COURT: That means you didn't need to do any discovery.

MR. SWEARINGEN: That's correct, Your Honor.

THE COURT: You have one day to complete your disclosures. I'm granting your continuance for one day, and we will continue the trial of this case tomorrow morning.

MR. SWEARINGEN: Thank you, Your Honor.

THE COURT: That's all you asked for; that's all you're getting.

. . . .

Your objection, Mr. Swearingen, is sustained.

Your continuance is granted for one day.

Wellmann did not object to the one-day continuance to allow Henderson to make the requested disclosures, nor did he ask for any additional time to prepare after the disclosures were made. In fact, Wellmann affirmatively stated that he did not need to do any further discovery. Therefore, Wellmann has waived his complaint regarding Henderson's failure to respond to his request for disclosures. Accordingly, we overrule Wellmann's first issue.

In his second issue, Wellmann contends that Henderson's "republication" of her allegations at the arbitration hearing was sufficient evidence of slander and libel within the statute of limitations. We review the granting of a motion for JNOV to determine whether there is any evidence upon which the jury could have made the finding, reviewing the record in the light most favorable to the finding, considering only the evidence and inferences that support the finding, and rejecting the evidence and inferences contrary to the finding. *Navarette v. Temple Indep. School Dist.*, 706 S.W.2d 308, 309 (Tex.1986). If there is more than a scintilla of competent evidence to support the jury's finding, then the JNOV will be reversed. *Southern States Transp., Inc. v. State*, 774 S.W.2d 639, 640 (Tex.1989).

Wellmann argues that Henderson published defamatory statements in written and oral form at the arbitration hearing on May 14, 1997 and that he filed his lawsuit less than one year later on October 3,

1997. He directs us to Henderson's trial testimony as evidence showing she made oral and written defamatory statements during arbitration. That testimony was as follows:

Q. Okay. So, ma'am, you—you testified at an arbitration proceeding on May the 14th, 1997, didn't you? I'm not trying to trick you with the date, ma'am.

A. Yes, I testified at arbitration.

Q. And that was May the 14th—I'll testify to you that's a true date. May the 14th, 1997.

A. Okay.

. . . .

Q. . . . . Now, you testified earlier— on May 14th, 1997, you testified in an arbitration hearing involving Mr. Wellmann, didn't you?

A. Yes.

Q. Did you know what the purpose of that arbitration hearing was?

A. I could only assume that it was part of the appeal process so that Ralph could get his job back.

Q. Okay. So it was for Ralph to get his job back?

A. Yeah. Yes.

Q. Had Ralph asked you to come testify there, ma'am?

A. No.

Q. You came on your own, didn't you?

A. Yes.

Q. No one forced you to come, did they?

A. No.

Q. Is the reason you came to make sure Ralph didn't get his job back?

A. No.

Q. So over a year later, Ralph is trying to get his job back. You come there to testify, and you didn't do that to make sure he wouldn't get his job back?

A. Right. I did not do that.

Q. Okay. Who asked you to come to the hearing?

A. Glenn Dowling.

Q. Glenn Dowling. Did anyone else talk to you about the fact there was going to be a hearing?

A. About coming? No.

Q. Did anyone else talk to you about the fact there was going to be a hearing?

A. No.

. . . .

Q. So prior to May the 14th, ma'am, you didn't know there was going to be a hearing?

A. No.

Q. So that phone call on May the 14th was your one and only notification that there was going to be a hearing?

A. Yes. I didn't know a hearing was going on.

Q. Okay. But somehow you knew that hearing was for Ralph to try to get his job back?

A. No. I didn't know it was for Ralph to get—I was assuming that that was probably what it was about.

. . . .

Q. When you received the telephone call asking you to come to the hearing, did they tell you that the hearing might not be going well and they needed your testimony?

A. No.

. . . .

Q. Did they tell you they needed your testimony?

A. They told me they needed me to come and speak on his behalf.

Q. On whose behalf?

A. Glenn Dowling.

Wellmann contends that, from this testimony, the jury could *infer* that Henderson

republished her defamatory statements in both written and oral form. We disagree.

Henderson's testimony at trial did not in any way allude to the nature of her testimony at arbitration. The record of the arbitration hearing was not before the jury at trial.[2] There was no evidence at trial regarding the use, at the arbitration hearing, of the Memorandum of Record, which was written by Dowling, not Henderson. Based upon the evidence, any reliance by the jury on evidence offered at the arbitration would be mere speculation.

■■■ Finally, the arbitration was a quasi-judicial proceeding initiated by Wellmann. Any statements, written or oral, at that hearing were absolutely privileged and could not be the basis for claims for libel or slander. *See James v. Brown,* 637 S.W.2d 914, 916–17 (Tex.1982) (witness's absolute privilege to publish defamatory matter in judicial proceeding attaches to all aspects of the proceeding); *Reagan v. Guardian Life Ins. Co.,* 140 Tex. 105, 166 S.W.2d 909, 912 (1942) (rule of absolute privilege for communications published in judicial proceedings applies to quasi-judicial proceedings); *Rose v. First Am. Title Ins. Co.,* 907 S.W.2d 639, 641 (Tex.App.— Corpus Christi 1995, no writ) (same).

We hold there is no evidence to support a finding that, within the one-year statute of limitations, Henderson libeled or slandered Wellmann. In addition, we hold that any defamatory statements made at the arbitration hearing were absolutely privileged. Accordingly, we overrule Wellmann's second issue.

**Conclusion**

We sustain Henderson's first issue. Because Wellmann did not establish his claim for intentional infliction of emotional distress, there can be no recovery for malice.

We overrule Wellmann's issues and affirm that portion of the judgment granting Henderson's judgment notwithstanding the verdict on the issues of libel and slander. We reverse the judgment on the issues of intentional infliction of emotional distress and malice and render judgment that Wellmann take nothing.

---

2. Wellmann offered the record of the arbitration hearing only for the purpose of impeach-

ing Dowling. The trial court sustained Henderson's objection to that offer.